FILED
2022 Jan-21  PM 04:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **BARRY BROOME, an individual, on behalf of himself and all others similarly situated,** } } } } | |
| **Plaintiff,** } } } | |
| **v.** } } | **Case No.: 2:19-cv-01917-MHH** |
| **CRST MALONE, INC.,** } } | |
| **Defendant.** } | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

In this action, Barry Broome alleges that he and other truck drivers who haul loads for CRST Malone are – or were – employees of the company and entitled to a federal hourly minimum wage under the Fair Labor Standards Act.  Mr. Broome has asked the Court to provide notice of this action to other drivers like him pursuant to 29 U.S.C. § 216(b), so that other drivers may opt-in to this collective action.  (Doc. 68).  This opinion resolves Mr. Broome's motion for notice.

I.

"The broad remedial goal" of the FLSA "should be enforced to the full extent of its terms."  *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 173 (1989).  Through the FLSA, Congress sought "to correct and as rapidly as practicable to

eliminate" from industries engaged in commerce "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" without "substantially curtailing employment or earning power."  29 U.S.C. § 202(a) & (b).  To that end, a non-exempt employee – including an employee claiming misclassification as an independent contractor – may bring an FLSA action against his employer "for and in behalf of himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).

Section 216(b) "explicitly authorizes employees to bring minimum wage, overtime, and anti-retaliation claims for themselves and people like them." *Calderone v. Scott*, 838 F.3d 1101, 1104-05 (11th Cir. 2016).  "A collective action allows [FLSA] plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources.  The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged" policy or practice that violates the FLSA's hourly wage provisions.  *Hoffmann–La Roche*, 493 U.S. at 170.  "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."  29 U.S.C. § 216(b).  This written consent process is known as the opt-in process.

When a plaintiff brings a claim for unpaid wages under the FLSA and alleges that the action should proceed collectively, the plaintiff must ask a district court to

provide notice of the action to other employees to give the employees an opportunity

to participate in the opt-in process.

> Section 216(b)'s affirmative permission for employees to proceed on behalf of those similarly situated must grant the court the requisite procedural authority to manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure. See Fed. Rule Civ. Proc. 83. It follows that, once an [FLSA] action is filed, the court has a managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way.

*Hoffmann–La Roche*, 493 U.S. at 170-71.  Court-sanctioned notice provides uniform

information to employees to enable the employees to "make informed decisions

about whether to participate" in an FLSA action for unpaid wages.  *Hoffmann–La

Roche*, 493 U.S. at 170.  "By monitoring preparation and distribution of the notice,

a court can ensure that it is timely, accurate, and informative." *Hoffmann–La Roche*,

493 U.S. at 172.  If a court grants a plaintiff's request for notice of an FLSA action,

a district court, in evaluating the language proposed for the notice, "must take care

to avoid even the appearance of judicial endorsement of the merits of the action."

*Hoffmann–La Roche*, 493 U.S. at 174.

## II.

To establish that notice is warranted in this action, Mr. Broome must

demonstrate that other Malone drivers want to participate in this action and that other

Malone drivers are similarly situated to him. *Dybach v. Florida Dep't of Corr.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991).

### A.

"[A] plaintiff's mere stated belief in the existence of other employees who desire to opt-in is insufficient." *Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1277 (M.D. Ala. 2004) (citing *Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1236 (M.D. Ala. 2003)).  Courts have identified several indicators that may help a court determine whether other potential plaintiffs may wish to opt-in, including whether others already have filed a notice of consent to join the lawsuit. *Didoni v. Columbus Restaurant, LLC*, 327 F.R.D. 475, 480 (S.D. Fla. 2018).

Here, two Malone drivers have notified the Court that they wish to join Mr. Broome's action.  (Docs. 76, 77).  Thus, Mr. Broome has established that other Malone drivers desire to opt-in.

### B.

To make a collective action manageable and promote the efficiencies that caused Congress to authorize collective proceedings in FLSA wage actions, a district court may authorize notice to employees who are similarly situated to the plaintiff who filed the wage action.  In the Eleventh Circuit, district courts may use "a two-tiered approach in making a similarly-situated determination in opt-in collective

actions." *Mickles v. Country Club Inc.*, 887 F.3d 1270, 1276 (11th Cir. 2018). Under

the two-tiered approach,

> [a]t the first "notice stage," the district court decides whether notice of
> the action should be given to potential class members who could be
> similarly situated. *Id.* at 1218. This stage, which is usually based only
> on the pleadings and any affidavits submitted, typically results in
> "conditional certification" of a representative class. *Id.* "If the district
> court 'conditionally certifies' the class, putative class members are
> given notice and the opportunity to 'opt-in.' " *Id.* (quoting *Mooney v.
> Aramco Servs. Co.*, 54 F.3d 1207, 1214 (5th Cir. 1995) ). The action
> proceeds through discovery as a representative action. *Id.*
>
> The second stage is precipitated by a motion for decertification from
> the defendant, which is typically filed after discovery is complete and
> the matter is ready for trial. *Id.* At this stage, the court has more
> information and makes a factual determination of the similarly-situated
> question. *Id.* "If the claimants are similarly situated, the district court
> allows the representative action to proceed to trial." *Id.* (quotations
> omitted). If they are not similarly situated, "the district court decertifies
> the class, and the opt-in plaintiffs are dismissed without
> prejudice." *Id.* (quotations omitted). The class representatives (the
> original plaintiffs) then proceed to trial on their individual claims. *Id.*

*Mickles*, 887 F.3d at 1276 (citing and quoting *Hipp v. Liberty Nat'l Life Ins. Co.*,

252 F.3d 1208, 1218 (11th Cir. 2001)). "[T]he more material distinctions revealed

by the evidence, the more likely the district court is to decertify the collective action"

at the second stage. *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007).

Issues that a district court may consider at the decertification stage include

differences in "factual and employment settings of the individual plaintiffs,"

defenses that "appear to be individual to each plaintiff," and "fairness and procedural

considerations." *Thiessen v. Gen'l Electric Capital Corp.*, 267 F.3d 1095, 1103 (10th

Cir. 2001), *cited with approval* in *Anderson*, 488 F.3d at 953.  At the second stage, a district court may consider whether trial management concerns weigh in favor of decertification.  *Thiessen*, 267 F.3d at 1105.

To meet the "similarly situated" standard and have the case proceed as a collective action, an FLSA plaintiff must show that his position is "similar, not identical, to the positions held by putative class members." *Hipp*, 252 F.3d at 1217 (quotations and citations omitted).  When using the two-tiered approach to a collective action, at the first stage, the plaintiff's burden to establish a basis for notice to putative class members is not heavy.  *Hipp*, 252 F.3d at 1219.

In *Mickles*, the Eleventh Circuit explained that in *Hipp*, its leading case concerning collective actions, it "noted that nothing in our circuit precedent *requires* district courts to use this [two-tiered] approach.  Instead, 'we suggest[ed] an approach district courts can use to better manage [§ 216(b)] cases.'  We described the two-tiered approach as an 'effective tool for district courts to use in managing these often complex cases.'" *Mickles*, 887 F.3d at 1276-77 (quoting *Hipp*, 252 F.3d at 1214, 1219) (emphasis in *Mickles*).  Because the parties already have conducted some discovery, Malone suggests that the Court should "assess the propriety of distributing notice to potential opt-ins under the more demanding standard applied at the second, decertification stage." (Doc. 73, p. 19).  Malone cites several cases in which district courts have applied an intermediate standard after some discovery has

occurred.[1]  Those courts rely on *Davis*.  In *Davis*, the district court found that courts use a lenient "notice stage" standard in "the early stages of litigation" when "plaintiffs have not had time to conduct discovery and marshal their best evidence." 303 F. Supp. 2d at 1276.  "This rationale disappears, however, once plaintiffs have had an opportunity to conduct discovery with respect to defendant's policies and procedures."  *Davis*, 303 F. Supp. 2d at 1276.

Recently, in *Swales v. KLLM Transport Services, L.L.C.*, the Fifth Circuit Court of Appeals held that, before notice is approved, district courts in that circuit must examine closely the extent to which proposed notice recipients are similarly situated to the named plaintiff and, if necessary, order discovery to develop evidence to inform the analysis.  985 F.3d 430 (5th Cir. 2021).  The Fifth Circuit recognized the importance of notice in collective actions, stating:

> The trial court's notice-giving role is pivotal to advancing the goals and evading the dangers of collective actions. An employee cannot benefit from a collective action without "accurate and timely notice," as the Supreme Court put it in *Hoffmann-La Roche, Inc. v. Sperling*.

*Swales*, 985 F.3d at 435.  The Fifth Circuit also recognized that notice that precedes a substantive application of the similarly situated test sometimes causes notice to be

---

[1] *See Crutcher v. Millennium Nursing and Rehab Ctr., Inc.*, 2010 WL 11564891, at *1, 5-6 (N.D. Ala. Aug. 18, 2010) (holding that "a more stringent analysis" applied because the parties had engaged in nearly four months of "discovery related to the issue of class certification"); *Pickering v. Lorillard Tobacco Co., Inc.*, 2012 WL 314691, at *8-9 (M.D. Ala. Jan. 30, 2012) (holding that "a stricter, more searching, standard of review" applies following four months of bifurcated discovery focused entirely on the certification issue).

distributed to individuals "who cannot ultimately participate in the collective." *Swales*, 985 F.3d at 441 (quoting *In re JPMorgan Chase & Co.*, 916 F.3d 494, 502 (5th Cir. 2019) (internal marks omitted)).

The Fifth Circuit adopted the following procedure for determining whether potential notice recipients are similarly situated to the named plaintiff in an FLSA action for wages:

> [A] district court should identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of "employees" is "similarly situated." And then it should authorize preliminary discovery accordingly. The amount of discovery necessary to make that determination will vary case by case, but the initial determination must be made, and as early as possible.

*Swales*, 985 F.3d at 441.  The Fifth Circuit explained:

> [I]n a donning and doffing case, notice might be justified when the pleadings and only preliminary discovery show sufficient similarity between the plaintiffs' employment situations. In those types of cases, the plaintiffs all have the same job description, and the allegations revolve around the same aspect of that job. So, a district court will not likely need mountains of discovery to decide whether notice is appropriate. In another case, such as this one, where Plaintiffs have demonstrably different work experiences, the district court will necessarily need more discovery to determine whether notice is going out to those "similarly situated."
>
> Considering, early in the case, whether merits questions can be answered collectively has nothing to do with endorsing the merits. Rather, addressing these issues from the outset aids the district court in deciding whether notice is necessary. And it ensures that any notice sent is proper in scope—that is, sent only to potential plaintiffs.

*Swales*, 985 F.3d at 441-42.   After a district court examines the evidence and evaluates whether the plaintiffs and potential notice recipients are similarly situated, the district court may conclude that the plaintiffs "have not met their burden of establishing similarity." *Swales*, 985 F.3d at 443.   "If that is the case," a district court "may decide the case cannot proceed on a collective basis." *Swales*, 985 F.3d at 443.   Alternatively, a district court "may find that only certain subcategories" of employees "should receive notice." *Swales*, 985 F.3d at 443.   If the plaintiffs establish that a large group of employees are similarly situated, then a district court may approve distribution of notice to all employees in that group.

The analysis in *Swales* is helpful because the Fifth Circuit's notice process requires a district court to tailor early discovery to the issues that the court ultimately will have to examine to decide whether an FLSA action for unpaid wages may proceed on a collective basis.   The *Swales* process promotes efficiency by ensuring that the time and expense inherent in the distribution of notice is warranted.   The *Swales* process enables parties to forego that time and expense in cases that are unmanageable on a collective basis because employees' potential wage claims do not rest on common issues of law and fact.   Because district courts in the Eleventh Circuit are not bound to follow the *Hipp* two-step certification process and because this action lends itself well to the *Swales* process, the Court will use *Swales* to

evaluate Mr. Broome's contention that he and other Malone drivers are similarly situated.[2]

Mr. Broome proposes that the Court provide notice to:

All current and former drivers for Defendant CRST Malone, Inc. in the United States of America who worked during trips of 24-hours or more, at any time beginning March 30, 2017 until the date of judgment after trial.

(Doc. 68, pp. 1-2).  To examine Mr. Broome's proposal, the Court set a two-month time frame for notice discovery.  (Doc. 57).  According to Malone, "[Mr.] Broome served and received responses to 25 written discovery requests . . . and the parties have exchanged 1,225 pages of documents."  (Doc. 73, pp. 18-19).  Counsel for Malone deposed Mr. Broome, and Mr. Broome's attorney took a 30(b)(6) deposition of Malone.  (Docs. 71-1, 72).

The evidence before the Court indicates that approximately 680 truck drivers operate under Malone's umbrella.  (Doc. 72, p. 38, tp. 37).  The 680 drivers fall into three categories.  There are drivers who lease their trucks through a lease-purchase program with CRST Lincoln, Malone's affiliate; drivers who own their trucks; and drivers who carry loads for Malone through one of Malone's approximately 45 agents.  (Doc. 72, pp. 42-45, tpp. 41-44).  Of the 680 drivers, approximately 290 of

---

[2] In its notice of supplemental authority, Malone asks the Court to consider *Fuller v. Jumpstar Enterprises, LLC*, 2021 WL 5771935 (S.D. Tex. Dec. 6, 2021).  (Doc. 110).  The *Fuller* court applied the collective action standard that the Fifth Circuit Court of Appeals adopted in *Swales*. *Fuller*, 2021 WL 5771935, at *3.

them participate in the lease-purchase program, approximately 200 of them drive for one of Malone's agents, and the rest own their trucks.  (Doc. 72, pp. 42, 44, tpp. 41, 43).  Mr. Broome participated in the lease-purchase program.  (Doc. 71-12).

All lease-purchase drivers sign an Independent Contractor Operating Agreement – an ICOA – with Malone.  (Doc. 72, p. 69, tp. 68).  Mr. Broome signed Malone's standard ICOA.  (Doc. 72, p. 60, tp. 59).[3]  The ICOA classifies lease-purchase drivers as independent contractors.  (Doc. 71-4, pp. 5, 11, 16).  The ICOA sets the compensation for a lease-purchase driver at 75 percent of the adjusted gross line haul revenue for each load hauled.  (Doc. 71-4, p. 37).[4]

The ICOA imposes job responsibilities and restrictions on all lease-purchase drivers.  Job responsibilities include "mak[ing] timely and safe deliveries of all loads" and "notify[ing] Carrier when delivery has been made or when delivery will be delayed for any reason."  (Doc. 71-4, p. 11).  The restrictions imposed by the ICOA contribute to Mr. Broome's allegation that he and other Malone drivers are employees, not independent contractors.  For example, the ICOA states:  "[S]olely

---

[3] Malone's President testified that he is not sure whether every driver receives an identical ICOA, (Doc. 72, pp. 59-60, tpp. 60-61), but he is not aware of differences among the ICOAs he has seen, which he estimates to be approximately two dozen.  (Doc. 72, p. 60, tp. 59).

[4] For each load hauled, each driver also receives 75 percent of the "detention" fee, (Doc. 72, p. 95, tp. 94), 100 percent of the "fuel surcharge," (Doc. 72, p. 95, tp. 94), and 75 percent of the "tarping" fee, (Doc. 72, p. 96, tp. 95).

In contrast, in *Swales*, "KLLM offered 41 different compensation arrangements that the drivers could choose from."  *Swales*, 985 F.3d at 442.

to comply with 49 C.F.R. § 376.12(c)(1), Carrier shall have exclusive possession, control, and use of the Equipment for the duration of this Agreement." (Doc. 71-4, p. 5). To that end, the ICOA requires lease-purchase drivers to obtain Malone's written consent before hauling a load for a motor carrier other than Malone. (Doc. 71-4, pp. 5-6). Another motor carrier's load is known as a trip leased load. Malone's president testified that the company rarely approves trip leases for lease-purchase drivers. (Doc. 72, p. 63, tp. 62).[5] Additionally, lease-purchase drivers need consent from Malone before hiring additional drivers. (Doc. 71-4, pp. 10-11). The ICOA provides that the relationship may be terminated at will, by either party, for any reason, with 20 days' written notice. (Doc. 71-4, p. 21). Apart from the ICOA, Malone applies a robust disciplinary scheme to "All CRST Malone Contractors and Lease Operators." (Doc. 72-12, pp. 2-6).

As indicated, Mr. Broome asks to include in this action only drivers "who worked during trips of 24-hours or more." (Doc. 68, pp. 1-2). The limitation ensures that one of the issues central to Mr. Broome's claim – whether hours spent resting in the truck's sleeper berth are compensable – is common to all drivers in his proposed collective action.

---

[5] Malone's president estimated that only three trip leases had been approved during his 23 months at Malone. (Doc. 72, p. 63, tp. 62).

Malone argues that identifying drivers who qualify for Mr. Broome's proposed notice "and evaluating the sufficiency of their compensation on a contractor-by-contractor, workweek-by-workweek basis would be a herculean task" and that "[t]his kind of highly individualized inquiry is not suited for collective adjudication." (Doc. 73, p. 31). This argument speaks to the calculation of unpaid wages. In support of its argument, Malone cites *Blakley v. Celadon Group, Inc.*, 2017 WL 6989080 (S.D. Ind. Oct. 18, 2017). The district court in *Blakley* stated:

> [A]lthough Named Plaintiffs argue that such an individualized calculation is acceptable in a collective action setting because damages need not be determined on a class-wide basis, such an argument does not support certification of a collective action here because the individualized calculation at issue informs the liability determination for violating the FLSA, rather than merely the damages calculation.

2017 WL 6989080, at *4 (internal citation omitted).[6] Malone argues that the same logic applies here because liability with respect to Mr. Broome's wage claim or the claim of another driver has not been conclusively established.

This case differs from *Blakely* because there are common liability issues that do not intersect with a calculation of damages. For example, if drivers like Mr. Broome are independent contractors, then the FLSA does not apply to them, and Malone is entitled to judgment on Mr. Broome's claim and the claim of other drivers

---

[6] Malone also directs the Court's attention to two other district court cases standing for similar propositions.

like him who join this action. Likewise, if federally-mandated rest periods for drivers are not compensable time, then Mr. Broome and drivers like him who join this action likely will not be able to establish a minimum wage violation, given their compensable hours and their income. Resolution in one proceeding of these common issues of law and fact arising from the same alleged policy or practice satisfies the purposes for which Congress has authorized collective proceedings in FLSA actions.[7]

Still, the evidence does not establish that Mr. Broome is similarly situated to every Malone driver "who worked during trips of 24-hours or more." (Doc. 68, pp. 1-2). Were the Court to authorize notice to all 680 drivers who deliver loads for Malone, the Court likely would not be able to determine on a collective basis whether the drivers are independent contractors or employees. The differences among drivers who carry loads under contracts with agents, Malone drivers who operate trucks they own, and Malone drivers who operate under a lease-purchase agreement would preclude collective resolution of Mr. Broome's minimum wage claim.[8]

---

[7] By analogy, under Rule 23(c)(4), a district court may certify a "class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4); *see Reitman v. Champion Petfoods USA, Inc.*, 830 Fed. Appx. 880, 882 (9th Cir. 2020); *Martin v. Behr Dayton Thermal Products LLC*, 896 F.3d 405 (6th Cir. 2018) (affirming district court's certification of seven issue classes).

[8] Drivers who own their own trucks have the same pay scheme, responsibilities, and restrictions as lease-purchase drivers, but payroll deductions differ for owner drivers and lease-purchase drivers like Mr. Broome, and the lawfulness of various deductions is an important legal issue in evaluating potential FLSA violations in this action. For lease-purchase drivers like Mr. Broome, deductions are numerous: "deductions for cost of truck and trailer, fuel, insurance, maintenance,

The Court can eliminate significant differences among drivers by providing notice to a subcategory of drivers who, like Mr. Broome, operate for Malone pursuant to a uniform lease-purchase program.  Lease-purchase drivers like Mr. Broome share job titles, job responsibilities, work restrictions, and pay provisions (including deductions) and are subject to Malone's disciplinary scheme.  Lease-purchase drivers are in sufficiently similar – though not identical – positions to Mr. Broome with respect to the economic realities of their relationship with Malone such that collective determination of their status is feasible and practicable for all involved—the lease-purchase drivers, Malone, and the Court.  *Hipp*, 252 F.3d at 1217.  The issue of whether federally-mandated breaks taken by lease-purchase drivers are compensable hours may be determined collectively because the ICOA mandates these breaks, and federal regulations dictate the duration of the breaks.  49 C.F.R. § 395.3(a).  Finally, the issue of which lease-related deductions Malone may lawfully take from compensation may be determined collectively for lease-purchase drivers.

---

bonds, taxes, licenses, and physical equipment on the truck."  (Doc. 68, p. 25).  Many of these lease-related deductions are not likely to be taken from owner drivers.

Drivers for Malone's agents do not sign an ICOA.  (Doc. 72, p. 221, tp. 220).  In fact, Malone has no direct contractual relationship with agent drivers.  (Doc. 72, p. 44, tp. 43).  There are agreements only between the driver and the agent and between the agent and Malone.  (Doc. 72. pp. 44-45, tpp. 43-44).  The Court is not aware of evidence that indicates that Malone makes lease-related deductions from payments to agent drivers.

"The judicial system benefits [from the] efficient resolution in one proceeding of [these] common issues of law." *Hoffmann-La Roche*, 493 U.S. at 170.  Denying notice to lease-purchase drivers because those drivers are not identical in all respects would defeat "[t]he broad remedial goal" of the FLSA's collective action provision. *Hoffmann-La Roche*, 493 U.S. at 173.  Thus, the Court will allow Mr. Broome to provide notice to Malone lease-purchase drivers.

## III.

For the reasons discussed above, the Court authorizes Mr. Broome to notify Malone lease-purchase drivers of this FLSA action and to provide opt-in information.  Given the subset of drivers for whom the Court will authorize notice, Mr. Broome's description of the drivers to whom notice should be sent is too broad. Consistent with this order, within 14 days, the parties shall confer and propose an amended notice for Malone lease-purchase drivers.

**DONE** and **ORDERED** this January 21, 2022.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE